RANDY S. GROSSMAN
United States Attorney
NICOLE E. BREDARIOL
MA Bar: 696484
Special Assistant U.S. Attorney
U.S. Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-8419
Email: Nicole.Bredariol@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JUAN CARLOS GARCIA MERAS (1),<br>ELIAZAR PATINO MARTINEZ (2),<br>GERARDO CUEVAS (3),<br>ABRAHAM ACOSTA (4),<br>RUBEN DARIO PERLAZA (5),<br>JAIRO BONE (6),<br><br>　　　　　Defendants. | Case No.: 21-CR-637- GPC<br><br>**UNITED STATES' OMNIBUS SENTENCING MEMORANDUM AS TO ALL DEFENDANTS**<br><br>Date: March 21, 2022<br>Time: 10:00 a.m. |

　　　　The UNITED STATES OF AMERICA, by and through its counsel, Randy S. Grossman, United States Attorney, and Nicole E. Bredariol, Special Assistant United States Attorney, hereby files its Sentencing Memorandum as to all defendants. This memorandum is based upon the files and records of the case.

**I.　　INTRODUCTION**

　　　　Defendant 1: Juan Carlos Garcia Meras (MERAS), Defendant 2: Eliazar Patino Martinez (MARTINEZ), Defendant 3: Gerardo Cuevas (CUEVAS), Defendant 4: Abraham Acosta (ACOSTA), Defendant 5: Ruben Dario Perleaza (PERLAZA), and Defendant 6: Jairo Bone (BONE)(collectively "Defendants") are before the Court for

sentencing after pleading guilty to Possession of Cocaine with Intent to Distribute on Board a Vessel in violation of 46 U.S.C. § 70503. A substantial sentence is warranted here. Maritime cocaine smuggling is complicated. The skill necessary for a crew of six men to transport cocaine on the high seas takes skill and experience. Engaging in a journey that will take days and requires navigating hundreds of miles on the ocean takes extensive preparation. Defendants relied on each other during this extended journey and worked together, utilizing their skill and acumen to try and achieve a significant reward – a payday.  When discovered by law enforcement, Defendants intentionally increased their speed and fled at a high rate of speed to evade being stopped. During their flight they jettisoned numerous packages of cocaine. Committed to their flight, Defendants failed to stop after warning shots and only stopped when the Coast Guard officers, pursuing them from a Coast Guard smallboat, overtook the Defendants, maneuvered alongside, and shot out the outboard engines of Defendants' vessel.  After taking into consideration the seriousness of the offense, including the level of skill and preparation required to transport approximately 218 kilograms of cocaine, and the remaining 3553(a) factors, the United States recommends 84 months' custody followed by 5 years' supervised release, no fine, and a $100 special assessment.

## II.     STATEMENT OF FACTS

### A. The Crime

On February 21, 2021, a maritime patrol aircraft (MPA) detected a Go-Fast Vessel (GFV) approximately 413 Nautical miles (NM) south of El Marques, Mexico in international waters. United States Coast Guard Cutter ALERT was nearby and diverted to intercept the GFV.

The United States Coast Guard launched two smaller boats, with embarked Coast Guard law enforcement teams to intercept the GFV. As the Coast Guard smallboat arrived on scene with the GFV, the Defendants increased their speed (from approximately 10 knots to 20 knots) and fled from the Officers. The Coast Guard pursued the fleeing GFV with all six defendants onboard. Defendant 1, MERAS, was driving the GFV. The Coast Guard ordered the Defendants to stop and energized its blue light and sirens, but the Defendants continued to flee. The Coast Guard then fired warning shots, which the Defendants ignored and continued to flee at a high rate of speed. The Coast Guard observed Defendants jettison multiple packages of cocaine over the side of the GFV and into the water, some of which were recovered by the Coast Guard. The Coast Guard recovered approximately 11 packages that were jettisoned.



Cocaine recovered from jettison by GFV

The Coast Guard caught up to the GFV and moved alongside and shot out the outboard engines on GFV, using disabling fire to force the defendants to stop.



Slug Entry From Disabling Fire

Once the GFV was stopped, the Coast Guard conducted a Right of Visit boarding and identified the six defendants in this case as the six people onboard the GFV. None of the Defendants admitted to being the master of the vessel, but the other Defendants all looked at MERAS whenever the Coast Guard Officers asked questions. MERAS ultimately made a claim of Mexican nationality for the vessel and himself. The Coast Guard enacted the US/Mexico NAMSI to NAMSI SOP and conducted a forms exchange with Mexico. Mexico could neither confirm nor deny the nationality of the GFV, so it was treated as without nationality and subject to U.S. jurisdiction. The Coast Guard did not find any additional packages of cocaine on the GFV.

During the boarding, MERAS made a statement to the Coast Guard officers claiming that the purpose of the voyage was to pay off some debt. He indicated that the GFV left Mexico about four days earlier and met up with another vessel at sea that was carrying Ecuadorian defendants ACOSTA and BONE and Colombian defendant PERLAZA.

The Coast Guard recovered approximately 11 packages, weighing 218 kilograms from the jettison field.



Post-Arrest the Defendants provided various statements. Ultimately, agents discovered ACOSTA, BONE, and PERLAZA left on a drug laden semi-submersible vessel from Colombia approximately two weeks before they were interdicted by the Coast Guard. The drug laden semi-submersible vessel broke down a few days after departing Colombia. Defendants called for assistance and after a few days a GFV arrived to their location and all the drugs and the three defendants were transferred to the GFV. Defendants ACOSTA, BONE, and PERLAZA continued their at sea voyage on the new drug laden GFV heading towards Mexico. During their journey they rendezvoused with various other vessels for refueling of their GFV. They then rendezvoused with defendants MERAS, MARTINEZ, and CUEVAS and their GFV, the GFV that was ultimately interdicted by the Coast Guard, for an at sea transfer of the cocaine. Defendants MERAS, MARTINEZ, and CUEVAS departed on the GFV from Mexico approximately four days before the interdiction. After all the cocaine and all the defendants were transferred to the GFV that left from Mexico, an approximately six-hour process, the other GFV was sunk at sea. Defendants took turns driving the various GFVs.

**B. Defendants Statements**

During his presentence interview MERAS stated that he was motivated to commit the instant offense out of financial necessity.

During his post arrest MARTINEZ admitted to knowingly transporting drugs for a payment of approximately $150,000 Mexican pesos. MARTINEZ stated that he was

transported from his home to Manzanillo Beach, Colima, Mexico where he met the GFV loaded with food and equipment. MARTINEZ clarified that he, MERAS, and CUEVAS shared responsibility for operating the GFV. MARTINEZ understood that the plan was to meet up with another vessel to pick up narcotics. He received directions and communications via text on a satellite communication device. After eight days at sea following the departure from Mexico, MARTINEZ, MERAS, and CUEVAS met the remaining co-defendants who were in another GFV at a predetermined location. The drugs and co-defendants were transferred to the Mexican GFV. MARTINEZ admitted that when the Defendants were discovered by the Coast Guard they began jettisoning the cocaine.

During his presentence interview MARTINEZ clarified that he was offered an opportunity to participate in a drug smuggling venture in exchange for approximately $7,300. He opted to assist because of his financial need at the time.

During his post-arrest interview CUEVAS admitted to knowingly transporting drugs for a payment of approximately 1,500 pesos. After eight days at sea following the departure from Mexico, MARTINEZ, MERAS, and CUEVAS met the remaining co-defendants who were in another GFV at a predetermined location. The drugs and co-defendants were transferred to the Mexican GFV.

During his presentence interview CUEVAS affirmed he agreed to participate in this drug trafficking offense because he needed money.

During his post-arrest interview ACOSTA admitted to knowingly transporting cocaine. He claimed that he left the jungles of Colombia in a drug laden semi-submersible vessel. The vessel broke down approximately eight days after departing the jungle, and defendant BONE utilized a satellite phone to call for assistance. Another vessel reached their location and the cocaine and Defendants were transferred to the new GFV. After two days, they met another vessel with six Ecuadorian crewmembers who refueled their GFV. On February 20, 2021, he rendezvoused with defendants MERAS,

MARTINEZ, and CUEVAS and all cocaine and defendants were transferred to their GFV. It took approximately six hours to transfer the packages and sink the prior GFV.

During his presentence interview ACOSTA claimed he committed this offense out of financial necessity.

During his presentence interview PERLAZA stipulated to the factual basis of the plea agreement and did not discuss his motivation for participating in the instant offense.

During his post-arrest interview BONE confirmed he called for assistance after the drug laden vessel he was on broke down. He claimed that a replacement vessel was sent to transport him and his co-defendants. He believed the cocaine and the Defendants were destined for Mexico and that they would then be flown home after arriving in Mexico.

During his presentence interview BONE confirmed he knew that the trip involved drugs, and that he committed this offense for financial reasons, specifically he was hoping to purchase a house and a boat with the money he would be paid. He did receive some payment upfront, but claimed his spouse never received additional payment as promised. He confirmed he started the journey on a semi-submersible drug laden vessel, and that he was provided with a GPS and telephone with the coordinates to rendezvous with the GFV and the Mexican defendants.

### III. THE GUIDELINES

#### A. Calculation

Under USSG § 2D1.1 (c)(1), the base offense level is 36.[1] The United States is not recommending any enhancements nor any reductions for role. There is a two-level downward departure for safety valve and a three-level downward departure for acceptance of responsibility. Defendant is in Criminal History Category I. The resulting

---

[1] This base offense level is based on the amount of cocaine recovered by the U.S. Coast Guard, approximately 11 packages and a total of 218 kilograms of cocaine. As discussed in the statement of facts above, this is a jettison case and all cocaine that was on the GFV was jettisoned into the ocean by the Defendants. It is unclear whether the Coast Guard recovered all the cocaine that was jettisoned by the Defendants, or just a portion.

guideline range is 108 to 135 months in custody. Pursuant to the plea agreement the United States is recommending 84 months in custody for each Defendant - a substantial variance of 24 months or approximately a twenty percent reduction of the low end of the guideline range.

**B.      Government Recommendation**

Several factors justify the Government's recommendation. First, Defendant pled guilty to Possession of Cocaine with Intent to Distribute on Board a Vessel. Maritime drug smuggling is a complicated endeavor. The evidence demonstrates the defendants coordinated an at sea voyage spanning hundreds of nautical miles to transport a vast amount of cocaine valued at millions of dollars. Transporting cocaine on the high seas takes considerable skill and experience. That skill promised a significant reward. For Defendants that reward was monetary.

Additionally, in this case Defendants took every effort to evade law enforcement and spoliate potential evidence. They failed to stop when the Coast Guard approached, and fled for an extended period of time, intentionally increasing their speed and jettisoning bales of cocaine. Through the choices Defendants made to flee from law enforcement and jettison the cocaine, they created a substantial risk of bodily injury both to themselves, and to the Coast Guard officers who were pursuing them.  But for the skill, training, and acumen of the Coast Guard the defendants very well could have caused serios injury during their flight which resulted in the need to use both warning shots and disabling fire, and they might have successfully evaded prosecution.

Second, this was a complicated smuggling venture for which Defendants preparation, expertise, experience, and efforts were critical. Each acted as more than a mere drug courier which this district often encounters for sentencing in land-based drug smuggling ventures. Maritime smuggling requires specialized skills, and men like Defendants are recruited because of their familiarity with the maritime environment. That required skill is evident in this case, where Defendants were discovered hundreds of miles from their home countries. Arriving to the interdiction location, over 400 NM from

Mexico, required each to prepare to be away from home for an extended period of time, to help navigate the vessel over a multi-day journey spanning hundreds of miles, and complete a complicated at sea vessel rendezvous. Over this extended time each was required to deal with all the difficulties that navigating on the high seas brings, including weather, sea state, and difficult communications. This requires expertise and experience and cannot be performed by just anyone. Unlike a simple drug courier who may only be responsible for drugs for a few hours and a few miles during a border crossing, this journey required Defendants to be responsible for the cocaine for hundreds of miles and days.

  Third, the United States does not believe an adjustment for role, either aggravating or mitigating, is appropriate in this case. The United States is not arguing for a navigator enhancement. Defendants took turns navigating and driving the GFV. Defendants operated as a team, utilizing tremendous skill, training, and acumen as discussed. All six were literally stuck in the same small boat, and equally culpable. Each Defendant is not less culpable than the average participant—let alone *substantially* less culpable. Defendants also understood the scope of this crime, each was to take part in the transport of cocaine from Colombia/Ecuador to Mexico – either by bringing the cocaine on a vessel from Colombia, or rendezvousing with the cocaine laden vessel, transfer it to another vessel, and transport it to Mexico for further distribution. Defendants were involved in planning for and preparing for the criminal activity. As one of six men on this vessel in the middle of the high seas each was in control of the vessel. Finally, Defendants stood to benefit from the criminal activity, and engaged in this crime for financial reasons.

  Fourth, Defendants were responsible for trafficking a large amount of cocaine – 218 kilograms. While Defendants may claim each did not intend to come to the United States, the role in transporting the cocaine in the GFV was critical to the success of the trafficking venture and it was foreseeable the cocaine was bound for the United States. During a maritime drug smuggling venture the value of the drugs, and potential profit, increases exponentially. Had this cocaine successfully made it to the United States it would have

been worth tens of millions of dollars. There is no doubt that had this highly dangerous drug successfully made it to the United States it could have led to extensive harm.

Fifth, given the need to generally deter others, it is essential the sentence reflects the seriousness of this offense and the potential harm from trafficking cocaine on the high seas. Only a significant sentence will discourage future potential traffickers from engaging in similar crimes. The incentive to make relatively large sums of money for trafficking drugs must be combated with the deterrence of significant sentences for engaging in this criminal activity. This is highlighted by Defendants' explanation that the motive to participate in the instant offense was monetary. There is a need to impose a sentence that adequately deters others from engaging in this criminal activity for the hopes of financial reward.

Sixth, the variance already recommended by the United States appropriately accounts for any variances based on the history and characteristics of the defendant or COVID-19. Defendants were entrusted to smuggle approximately 218 kg of cocaine hundreds of miles while operating far from land with some autonomy. When discovered by law enforcement, they chose to flee and did everything they could to evade capture by speeding away and jettisoning the cocaine, placing both themselves and law enforcement in danger. Their sentence should reflect their extensive culpability.

### C. Conclusion

Based on the 3553(a) factors a custodial sentence of 84 months, followed by 5 years' supervised release, no fine, and a $100 special assessment is appropriate for each of the Defendants.

DATED: March 10, 2022

Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

*/s/ Nicole E. Bredariol*
Nicole E. Bredariol
Special Assistant U.S. Attorney